BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA VALLIERE (DCBN 439353)
Chief, Criminal Division

AMBER ROSEN (CABN 160380)
PATRICK DELAHUNTY (CABN 2574392)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95115
    Telephone: (408) 535-5061
    FAX: (408) 535-5066
    Email:  amber.rosen@usdoj.gov
         patrick.delahunty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 15-00561 LHK |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | Date: July 26, 2017 |
| LAURENCE MILES, | Time: 9:15 a.m. |
| Defendant. | |

On April 6, 2017, defendant Laurence Miles, pleaded guilty, pursuant to a plea agreement under Federal Rules of Criminal Procedure 11(c)(1)(A) and 11(c)(1)(B), to one count each of conspiracy to commit wire fraud, wire fraud, and money laundering, in violation of 18 U.S.C. §§ 1349, 1343, and 1957, respectively.  The United States agrees with probation that Miles's Sentencing Guidelines' offense level is 31, assuming a criminal history category I.   Based on his decades-long fraud and the fact that there are no mitigating factors which take him out of the heartland of fraud cases, the United States recommends a guidelines sentence, which includes a term of imprisonment between 108 and 135 months.

## I. FACTUAL BACKGROUND

For more than a decade, Miles coordinated a fraudulent scheme in which he falsely promised people $1,000 for every dollar they provided for the purported medical expenses of a wealthy, terminally ill woman namely Shirley. ECF No. 90 at pp. 3-4 (Miles plea agreement admissions). Miles told his victims that he was the trustee for the estate of Shirley, which only could be disbursed if she survived to see through the end of the probate process—which was always imminent. *Id.* He also explained that though she was a billionaire, her money was tied up in the probate proceeding, preventing her from being able to afford the care she needed. *Id.* Through Miles' lies and alleged charm, he, along with his co-defendants, obtained approximately $8,303,971.

Miles did not invent this fraud. Rather, his co-defendant, Shirley Molina, made up the story and used it to perpetrate frauds in the 1980s and 1990s, for which she was twice convicted. When she met Miles in 2004, they apparently began to "work" together. Thereafter, Miles recruited others to join the scheme, such as Shirazi and Stephens. Attachments 1 and 2 (Shirazi and Stephens proffers). No later than 2007, Miles knew the truth (although presumably he always did given how ridiculous Molina's story was). That year, Miles was arrested in connection with the fraud, and he later learned from officers, unambiguously, that there was no estate and that it was all a fraud. ECF No. 90 (Miles plea) at p. 4. Yet, his fraudulent solicitation of donations for Shirley's "medical care" did not stop until his arrest in this case in late 2015.

Miles took a number of steps to minimize his fraudulent footprint. He encouraged investors to invest with cash, making it more difficult to track the funds or prove their provenance. Miles also provided cash to Molina, through funnel accounts, to help disguise her role in the offense. Attachments 3 and 4 (Roberson and Cooper interviews). In addition, Miles withdrew large amounts of cash from his accounts and brought cash to Shirley every couple of weeks. Attachment 1 (Shirazi proffer). In her plea, Shirley admitted to receiving a substantial amount of money from this scheme. ECF No. 70.

Despite those steps, Miles was the leader of the conspiracy. The vast majority of the investor funds were deposited into bank accounts Miles controlled, which he admitted in pleading guilty. ECF No. 90 at p. 4. And, Miles held himself out to investors as the trustee of the purported estate.

Miles has no verified employment history, and even he reports not working since 1994. Rather,

he has been living off the profits of his fraud.  It is time for him, finally, to bear the consequences of his devastating conduct.

## II. GUIDELINES CALCULATION

All parties agree that Miles has an adjusted offense level of at least 26, based on his base offense level of seven, an eighteen-level enhancement for the loss amount, a two-level enhancement for having more than ten victims, and a one-level enhancement for his money laundering conviction.  ECF No. 90.  Two issues remain disputed regarding his guideline calculation:  (1) whether Miles should receive a two-level enhancement for sophisticated means; and (2) whether he should receive a four-level enhancement for his role in the offense.  Additionally, the parties dispute the final loss amount, despite agreeing that it ultimately falls within a certain range.  The issues are addressed in turn below.

### A. Sophisticated Means

The PSR recommends applying the sophisticated means enhancement.  *See* PSR ¶ 70 (including enhancement) and Addendum to the Presentence Report at ¶¶ 18-19 ("PSR Addendum") (explaining rejection of Miles' objection to enhancement).  Notably, the enhancement is appropriate regardless of whether Miles' conduct mirrors the examples of sophisticated means in the Sentencing Guidelines, which is well established by the Ninth Circuit.  In addition, the enhancement is supported by Miles' efforts to use cash, including funneling it, and to conceal the scheme.

As an initial matter, fraudulent conduct need not involve shell corporations or tax havens in order to merit the enhancement.  *E.g. United States v. Augare*, 800 F.3d 1173, 1174 (9th Cir. 2015).  In *Augare*, the defendant argued that the particular aspects of the fraud supporting the enhancement were nothing more than essential steps in executing the scheme or "merely simple lies" used to obtain money he was not entitled to.  *Id.* at 1174-75.  He further argued that the conduct, which included transferring money between multiple accounts, stood in contrast to the example conduct in the application notes to the enhancement, such as setting up shell corporations or using foreign tax havens.  *Id.* at 1174.  Miles made a similar objection to the Probation Officer, and the United States anticipates he will continue to make it.  *See* PSR Addendum at ¶ 18.

This Court should follow *Augare*.  There, the Ninth Circuit emphasized the defendant's movement of funds through several accounts, including an account controlled by a co-defendant, before

3

ultimately using the money. 800 F.3d at 1175. Miles used similar means to further the scheme. While most money he received was sent directly by victims to accounts he controlled, some was not. *See* ECF No. 90 at p. (admission in plea agreement that "vast majority" of fraud proceeds were wired to Miles' controlled accounts). Instead, in some instances, Miles funneled cash through two different individual's accounts before disbursing cash to Molina. Attachments 3 and 4 (Roberson and Cooper interviews). Or, if Shirazi received funds from victims directly, then Miles would direct Shirazi to withdraw cash and give it to Molina. Attachment 1 (Shirazi proffer).

The enhancement is also supported by Miles' other efforts to conceal the scheme. For example, Miles frequently caused the victims to receive letters from himself or other defendants that offered elaborate explanations as to why their "investments" had not yet generated a return. Attachments 5 and 6. The letters frequently described complex legal proceedings that would be critically undermined by any investor-victim trying to investigate or examine why probate for the "estate" had not finalized. *Id.* Such repeated efforts to conceal the scheme may be "sufficiently sophisticated" to support the enhancement. *United States v. Tanke*, 743 F.3d 1296 (9th Cir. 2014). In *Tanke*, the Ninth Circuit applied the enhancement to a defendant who stole money from his employer in a scheme that "did not use 'fictitious entities, corporate shells, or offshore financial accounts,' as the Sentencing Commission's commentary contemplates." *Id.* at 1308 (quoting U.S.S.G. § 2B1.1 cmt. n. 9(B)). The defendant did, however, create false invoices and false carbon copies of checks to conceal his scheme. In addition to the lulling letters, Miles directed other, lower-level conspirators to directly interact with victims rather than allow them to contact him directly (Attachments 6 and 10); and, he commonly insisted upon the use of cash and funnel accounts to help conceal the true source of illgotten proceeds, as discussed above. This conduct supports the enhancement. *Tanke*, F.3d at 1308.

Nor does it matter that Miles' efforts to conceal were imperfect. For example, in *United States v. Jennings*, the defendant merely funneled money through an account that, although opened by him, used a business name that sounded like his company's primary vendor. 711 F.3d 1144 (9th Cir. 2013).[1]

---

[1] The defendant in *Jennings* was charged was tax fraud and sentenced under U.S.S.G. § 2T1.1. 711 F.3d 1144. That section of the Sentencing Guidelines, however, includes an application note regarding the enhancement that also lists the same examples as those in § 2B1.1 cmt. n. 9(B). Indeed, in explaining § 2B1.1's sophisticated means enhancement in *Augare,* the Ninth Circuit cited *Jennings*

4

Perhaps Jennings concealment could have been better. But the Ninth Circuit dismissed this argument, concluding, "the fact that the concealment might not have been total does not mean that there was no effort at concealment or that the method employed was not sophisticated." *Id.* at 1147. As a result, it is well settled that conduct that may be described as less sophisticated than the examples in the commentary to the Sentencing Guidelines can still support the application of the sophisticated means enhancement. *Id.* (collecting cases and holding "we agree with other circuits that the enhancement properly applies to conduct less sophisticated than the list articulated in the application note"). As a result, Miles cannot avoid application of the enhancement by drawing such a distinction between his concealment and the elevated types listed in the Guidelines.

### B.     Aggravating Role

The PSR concludes Miles' leadership role in the Shirley scheme merits a four-level adjustment to his offense level calculation. A four-level aggravating role adjustment applies when the defendant was the organizer or leader of a criminal activity that either involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1. Both criteria are met here.

Miles was a leader or organizer of the Shirley scheme.[2] Indeed, he held himself out as such. Miles—and everyone else in the scheme—described Miles as the "trustee" of the Shirley "trust," from which funds would be later disbursed to victim-investors. *See* ECF No. 90 at p. 5 (admission in plea agreement). Moreover, "the vast majority" of the funds derived from the scheme was deposited into accounts Miles controlled. *Id.* at p. 4. Miles would then dictate how much other participants, such as Shirazi and Molina, received. Attachment 1 (Shirazi proffer). Other participants, including other defendants, worked at his direction. For example, Shirazi commonly drove Miles to all his appointments for years (including delivery of cash to Molina), Stephens was instructed by Miles to speak to victim-investors on behalf of Miles, Stephens and Lakshmanan directed victim-investors to wire money to accounts controlled by Miles, and Carolyn Roberson and Lisa Cooper allowed Miles to funnel cash through their accounts, at his direction. Attachments 1 (Shirazi driving), 6 and 10 (Stephens

---

favorably. 800 F.3d at 1175.

[2] The commentary to § 3B1.2 indicates that there can be more than one leader or organizer for purposes of the adjustment. § 3B1.2 cmt. n. 4.

5

as mouthpiece), 2 and 9 (Stephens and Lakshmanan wiring money), 3 and 4 (funneling). Such conduct meets the criteria to classify a defendant as a leader organizer. *See* U.S.S.G. § 3B1.1 cmt. n. 4 (the factors to be considered when determining whether a defendant was an organizer or leader include: the exercise of decision-making authority, the claimed right to a larger share of the fruits of the crime, and the degree of control and authority exercised over others).

And, the Shirley scheme was "otherwise extensive." By Miles' own admission, it lasted at least twelve years. Attachment 5 (Miles 2015 letter to victims). He also admits that it caused at least $5.6 million in loss (ECF No. 90), and the government has identified at least eighty-four victims of the scheme. Attachment 11. Four other individuals were charged, and plead guilty, to their involvement in the scheme. In addition to them, there are numerous other individuals that participated, some unwittingly, in the scheme at the direction of Miles, including Roberson and Cooper. *See United States v. Rose*, 20 F.3d 367 (9th Cir. 1994) (otherwise extensive prong "depends on such factors as" (i) the number of knowing participants and unwitting outsiders, (ii) the number of victims, and (iii) the loss amount).

The Shirley scheme also included at least five participants. There are, of course, the five defendants (including Miles). *E.g. United States v. Sopo*, 431 Fed.Appx. 596, 597 (9th Cir. 2011) (unpub.) (defendant, plus four other participants, equals five participants for purposes of adjustment).

### C. The Loss Amount is $8,303,971

Although the enhancement for loss has been agreed to by the parties, the parties have not agreed on the precise amount of loss within the guideline range of $3,500,000 to $9,500,000. Since the preparation of the draft PRS, the United States has revised its determination of the loss amount. Based on its analysis, the United States now believes the loss is $8,303,971. Notwithstanding that, the parties have agreed, through meet and confer before their sentencing memorandums, that the loss amount is at least $6,779,164.

The disagreement is limited to a subset of victims. This group is reflected in the second-column of the attached document, the investor loss summary. *See* Attachment 11. The investor loss summary has two columns of loss. The first column is the amount of loss that the United States can corroborate with the defendants' bank records, victim statements, and where available, victim bank or other reliable

6

records. The second column shows loss that a victim claims to have suffered, which the United States was not able to corroborate with defendants' bank records. The United States could not corroborate these amounts with bank records either because the victim invested cash, which inhibited the ability to identify his or her deposit in the bank records, or because the victim's investment occurred before the time period for which the United States could obtain defendants' bank records and the victim's records were insufficient to corroborate the stated loss amount.

The United States believes that the number in the first loss column constitutes the least possible loss amount. It is agreed upon and corroborated with bank records. Regarding column two, at this point, the United States does not know what portion of this amount the defendant may contest. Column two of the investor loss summary reflects $1,524,807 that is substantiated with other documents. *See* Attachment 11. To include this amount in the loss amount, the Court must find by a preponderance of the evidence that the victims' statements are sufficiently reliable to establish that they are victims of the charged fraud and to accept the amount claimed for purposes of calculating loss. "The Court need not make its loss calculation with absolute precision: rather it need only make a reasonable estimate of the loss based on available information." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 1996). Additionally, victim statements may, in some instances, be sufficient by themselves to support the loss determination. *Cf. United States v. Waknine*, 543 F.3d 546 (9th Cir. 2008). There, the Ninth Circuit held that "victim affidavits will generally provide sufficient, reliable evidence to support a restitution order." *Id.* (though finding the affidavits in that case to be too conclusory). In this case, the victim statements, along with other items, are sufficient for purposes of determining loss and restitution. The fact that each of these victims gave money to Miles' scheme is, it seems, uncontested. The victims' statements often provide detailed recitations of the scheme. In some cases, the victim has emails with or other documents from the defendants that detail their investments. Nevertheless, rather than inundate the Court with such back-up documents, the United States will wait to see which victim-related losses are contested by the defendant before filing supporting documentation, which may be voluminous.

**III.         Term of Imprisonment and Section 3553(a) Factors**

The PSR recommends a term of imprisonment of 108 months, which is the low-end of the applicable guideline range. The government sees no reason to depart below this, and recommends that

the defendant be sentenced within the application guideline range. The recommendation is supported by the facts in this case and is consistent with Section 3553(a).

### A.  The Nature and Circumstances of the Offense, Including its Seriousness

The seriousness of the offense has been outlined above. But in sum, the seriousness of the offense is reflected in its duration, the number of victims, the amount stolen from the victims, the impact of the crime upon the victims (*see* PSR ¶ 40-61), and the persistent efforts to conceal the scheme. Put simply, this was not a crime of opportunity. Miles' conduct reflects a deliberate and repeated effort to steal.

The harm Miles caused was severe. Unlike some financial crimes, the victims here were not large financial institutions or entities that could simply rely upon their insurers to make them whole. Instead, a large number of people were seriously impacted. As noted in the PSR (¶ 55), one victim was ruined financially and had to postpone retirement. Another (¶ 58) said that participation in this investment "ruined his life." Another (¶ 59) indicates that she was "completely devastated for months," and writes that Miles "is particularly conniving, he plays a befuddled, kindly elderly British gentleman, when he is really nothing more than a common low-life criminal." The emotional and financial toll on the victims dictates a commensurate sentence.

### B.  The Nature and Circumstances of the History of the Defendant

Miles may argue that his professional and criminal history, along with his health, mitigate against the recommended sentence. Not so.

Miles may argue that he is too old, at 76, to pose a threat to the public, and that his health would make any prison sentence particularly severe. Yet, there is no reason to find such an argument credible. Miles was executing the scheme until he was 74, and appears to only have ceased when he was arrested. A scheme which depends upon deceiving victims through long emails, phone calls, and leisurely meals can be capably executed by a man in his late 70s. Miles' special skill, as he proudly told probation, is being a "people person," which does not disappear with age. PSR ¶ 99.

Moreover, Miles' purported health problems are uncorroborated and proffered by an individual with a long history of deception. Even if the defendant does substantiate his health needs, there is no reason to conclude that he will receive lesser care for them in prison. While released on conditions,

8

Miles admits his alleged diabetes are untreated and that he cannot afford medical treatment. He has also not demonstrated that he has a caretaker, a long-term care plan, or any type of assistance that would be superior to that offered by the Bureau of Prisons.

### C.   Deterrence

Miles presents a risk of recidivism. If he is not in prison, he has not demonstrated any means of supporting himself other than fraud. He is unmarried, has no financial assets, and his last reported employment was purportedly in 1994.

He also lacks an ability to conform his conduct. For example, in 2007, Miles was arrested on suspicion of conducting the Shirley scheme. Rather than admit to his role in it, Miles instead misrepresented his involvement and then continued to execute the scheme for another eight years. *See* PSR ¶ 87. Indeed, Miles' inability to comply with the dictates of the legal system persist. The PSR reflects numerous misrepresentations offered by Miles to the Probation Officer. The most egregious includes a continued insistence that he believed Shirley was sick and the estate was real. *See* PSR Addendum at ¶ 7. But Molina has admitted she was not seriously ill during the scheme (ECF No. 70, Molina plea), and Miles visited her approximately every two weeks to deliver cash. It also strains credibility for Miles to assert that he believed the estate was real for the duration of the scheme, which continued for at least twelve years. Similarly, Miles asserted to probation that he did not receive the majority of funds obtained by the scheme. *See* PSR Addendum at ¶ 7. Yet, he admitted to this in his plea. ECF No. 90 at p. 4.

## IV.   RESTITUTION

Miles is required to, and has agreed, to make full restitution to his victims. Indeed, the Mandatory Victim Restitution Act ("MVRA") states that courts "shall order" those convicted of certain crimes, including wire fraud, to "make restitution" to their victims. 18 U.S.C. 3663A(a)(1); *accord United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015) (citation omitted).

For the same reason that the United States asserts the loss is $8,303,971, restitution should also be ordered in that amount. Should the Court believe that the claims for restitution, where the United States was unable to corroborate the amount of loss in the bank records, is not sufficient for purposes of ordering restitution, the United States requests a restitution hearing to be set after the sentencing. *See* 18

U.S.C. § 3664(d)(4) (providing that if the loss is not ascertainable 10 days prior to sentencing, the Court "shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.")  Several reasons would support this request.  While a victim affidavit can be sufficient to meet the standard for restitution (*see Waknine*, 543 F.3d at 557), the Court may want to hear from the victim and make a credibility determination regarding the amount of money the victim invested, before rendering a ruling.  Moreover, because the victims made claims for restitution, the United States believes that they have a right to be heard before their claims are rejected.  *See, e.g.,* 18 U.S.C. § 3771(4) (providing that victims have "the right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding").  While the victims were informed of the sentencing hearing date, they may not realize that their claims to restitution could be rejected in their absence.

## V.  FORFEITURE

As part of his plea agreement, Miles agreed to a forfeiture money judgment in the amount of $5,628,765.  ECF No. 90 at ¶ 11.  As such, the United States will file a motion seeking this Court to sign, at the time of sentencing, a proposed order to that effect.

## VI.  CONCLUSION

The United States respectfully requests that defendant be sentenced within his guidelines range of 108 and 135 months' imprisonment, serve a three-year term of supervised release, be ordered to pay restitution of $8,303,971 to his victims, as indicated in the attached chart, and to pay a forfeiture money judgment in the amount of $5,628,765.

Respectfully submitted,

Date: July 19, 2017

BRIAN J. STRETCH
United States Attorney

\_/s/_____
AMBER ROSEN
PATRICK DELAHUNTY
Assistant United States Attorneys