Mark D. Flanagan (SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100

Timothy Charles Perry (SBN 248543)
timothy.perry@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone:  +1 213-443-5306
Facsimile:  +1 213-443-5400

*Attorneys for Defendant*
LAURENCE MILES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br><br>        v.<br><br>LAURENCE MILES,<br><br>                         Defendant. | Case No.  15-CR-0561-LHK<br><br>**DEFENDANT LAURENCE MILES'<br>SENTENCING MEMORANDUM AND<br>MOTION FOR A DOWNWARD VARIANCE**<br><br>The Honorable Lucy H. Koh<br><br>Sentencing Date:        July 26, 2017<br>Sentencing Time:        9:15 AM |

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ...................................................................................1

    A.    Personal History ...........................................................................................1

    B.    The Offense Conduct ....................................................................................3

III.  A RANGE OF 57-71 MONTHS IS THE CORRECT INITIAL GUIDELINES

       CALCULATION ....................................................................................................5

    A.    Miles' Adjusted Offense Level Is 25 ...........................................................5

          1.    An Enhancement Under U.S.S.G. § 3B1.1 Is Not Warranted .............6

          2.    An Enhancement Under U.S.S.G. § 2B1.1(b)(10)(C) Is Not Warranted............12

          3.    Miles Has Fully Accepted Responsibility for the Offense .................13

    B.    Miles' Criminal History Category is I .........................................................14

IV.   A DOWNWARD VARIANCE FROM THE GUIDELINES RANGE TO FOUR

       MONTHS MEETS THE REQUIREMENTS OF 18 U.S.C. § 3553(a) .................14

    A.    Factor One: The Nature and Circumstances of the Offense, and the History
          and Characteristics of Miles Support the Requested Sentence ....................14

          1.    The Nature and Circumstances of the Offense ..................................14

          2.    Miles' History and Characteristics....................................................15

    B.    Factor Two: A Sentence of Four Months Would Honor the Sentencing
          Goals Described in 18 U.S.C. § 3553(a)(2) ................................................16

          1.    Promoting Respect for the Law and Providing Just Punishment for the Offense16

          2.    Affording Adequate Deterrence to Criminal Conduct and Protecting the Public
             from Further Crimes by the Defendant................................................17

          3.    Providing Educational or Vocational Training or Other Correctional Treatment18

VI.   CONCLUSION....................................................................................................19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Table of Authorities

Page(s)

**CASES**

*Gall v. United States*, 552 U.S. 38 (2007) .................................................................5, 14

*United States v. Arabaye*, 234 F.3d 1101 (9th Cir. 2000)................................................12

*United States v. Avila*, 95 F.3d 887 (9th Cir. 1996).........................................6, 7, 8, 12

*United States v. Brandon*, 595 Fed. Appx. 676 (9th Cir. 2014).....................................12

*United States v. Brown*, 771 F.3d 1149 (9th Cir. 2014)...........................................6, 11

*United States v. Carter*, No. CR 09-0444 CRB, 2010 WL 1342812 (N.D. Cal. Apr. 5, 2010) ..........................................................................................................12

*United States v. Harper*, 33 F.3d 1143 (9th Cir. 1994) ....................................................6

*United States v. Horob*, 735 F.3d 866 (9th Cir. 2013)....................................................12

*United States v. Lopez-Sandoval*, 146 F.3d 712 (9th Cir. 1998) .......................................8

*United States v. Mehdi*, 511 Fed. Appx. 662 (9th Cir. 2013) .........................................12

*United States v. Rivera*, 527 F.3d 891 (9th Cir. 2008).....................................................9

*United States v. Suarez*, 655 Fed. Appx. 549 (9th Cir. 2016).........................................11

*United States v. Thomsen*, 830 F.3d 1049 (9th Cir. 2016) ..............................................13

*United States v. Whitney*, 673 F.3d 965 (9th Cir. 2012).................................6, 7, 8, 10, 11

## I.    INTRODUCTION

This Court should sentence Laurence Miles to four months.  This sentence is "just punishment" and is "sufficient but not greater than necessary" based on Miles' age, declining health, and lack of prior convictions.  18 U.S.C. § 3553(a).  It is also commensurate with Miles' role in Shirley Molina's scheme, and reflects his acceptance of responsibility.

## II.   FACTUAL BACKGROUND

### A.    Personal History

Miles was born in Bristol, England on January 1, 1941.  He was the youngest of six children born to Arthur Gordon Miles and Edith Lily Gwendoline Fox.  His father was a policeman who served his community for decades.  His mother had been a seamstress in a factory that made uniforms for soldiers during World War I, but was a homemaker by the time Miles was born.  Miles' oldest brother, Raymond, was serving in the British Army when Miles was born, and their sister, Mavis, served as an ambulance driver for the Women's Royal Air Force.

Miles grew up surrounded by people for whom the traumas of the Second World War were still very much a part of their daily lives.  Miles' parents were pillars of their small community.  Neighbors and friends looked up to them, and frequently called on them for support and advice.  One night, Miles' father saved a family of five from a house fire in their neighborhood, and received a commendation for his bravery.  Miles' service-oriented parents and siblings led by example, and against a backdrop of national turmoil, Miles grew up surrounded by love, honor, and a sense of moral obligation to help others.

When Miles was eight or nine years old, the headmaster of his school appointed him "head boy" of the Remembrance Sunday ceremony at the local church, which took place yearly on November 11 to honor the lives of students killed in the War.  Miles' task was to read the names of the fallen pupils of his school to commemorate their valor.  The headmaster reassured a nervous Miles that he had chosen him because he knew that he was capable and would do a good job.  The event was a tremendous honor for Miles, and he worked hard to prepare for it.  Miles felt that his headmaster believed in him, had chosen him, and was relying on him, and Miles wanted above all to please him and to make him proud.

- 1 -

This moment stands out for Miles as one of the most important of his childhood.  It encouraged him to pursue acting as a pastime, which became his primary activity and passion outside of school.  As a young adult, Miles traveled around England and Europe performing various dramatic roles, his favorite of which was Malvolio in Shakespeare's *Twelfth Night*.  Miles studied geography and drama at the University of Bristol, from which he graduated in 1958.  That same year, Miles married Ena Cayford.

Ena and Miles had four children—Richard; Elisabeth; Laurie Jr.; and Leigh-Anne—and eight grandchildren, two of whom are doctors or studying to be doctors, and two of whom are studying acting, like their grandfather.  Miles continues to maintain positive relationships with his children and grandchildren, despite the geographic distance and turmoil of recent years.  In 2015, Miles' son, Laurie Jr., whom Miles considered his mentor and "hero," passed away from cancer.  Laurie Jr. was a social worker in Bristol, and when he died, more than 200 people attended his funeral.  Miles met people there whom he had never seen in his life, but all of whom knew his son and were there to honor him.  Laurie Jr. manifested the values Miles' parents had instilled in him, and that Miles in turn built his life upon: people matter, and if you can help someone, you should.

Most of the children from Miles' part of town, including many of his siblings, went to work for one of the three main companies in the area—Bristol Aeroplane Company, W.D. & H.O. Wills tobacco company, or J.S. Fry & Sons chocolate company.  Miles, however, left England in 1960 and moved to Buena Park, California.  He worked briefly as an entertainer at Knott's Berry Farm (as a singing cowboy), and later at Hunt Foods in Fullerton, California.  Miles spent the next forty-five years of his life moving between England, Canada, and the United States for jobs primarily in the sales and insurance industries.  Miles served as managing director of several insurance brokerage firms in England, some of which he helped establish, before moving permanently to the United States in 1998.

In 1999, after an amicable separation from his first wife, Miles married Jacquelyn ("Jackie") Dillard, whom he met in Atlanta, Georgia.  Jackie was struck by Miles' "gentle manner and kindly demeanor," his humility, and his exceptional politeness.[1]  They spent their early years together

---

[1] Attachment A: Jacquelyn D. Miles' Letter to the Court.

1  volunteering for Habitat for Humanity, and delivering meals to home-bound seniors through the

2  Meals on Wheels program.[2]  When Miles moved to California to work full-time for Shirley Molina,

3  he and Jackie lived apart, but Miles "made considerable effort" to maintain their relationship despite

4  the geographic distance.[3]  Jackie and Miles divorced in September 2016, but they remain close

5  friends.

6  **B.    The Offense Conduct**

7  In 2004, while living in Atlanta, an acquaintance introduced Miles to an elderly gentleman

8  named Paul Herzwurm.  At that time, Miles' career path had shifted away from insurance, and he

9  was instead working to secure capital for a humanitarian project to eliminate landfills by building

10  waste treatment conversion plants.  Herzwurm told Miles that he worked for a woman in California

11  named Shirley Molina, the heiress to an immense estate currently tied up in probate proceedings.

12  Herzwurm told Miles that he would be able to contribute large sums of money to Miles' project as

13  soon as the estate funds were released.  He told Miles that Molina was seriously ill with mercury

14  poisoning and needed money to pay for blood transfusions.  Herzwurm convinced Miles to give him

15  $10,000 to pay for one of Molina's blood transfusions.[4]  Several days later, Molina called Miles to

16  thank him for his contribution, and told him that she would commit a large sum of money to Miles'

17  project as soon as her estate was released.

18  After several phone calls, Molina asked Miles to meet her in person in California, and Miles

19  agreed.  During their first meeting, Molina spent hours telling Miles her life story, including about

20  her wealthy father and medical troubles.  She then asked Miles to serve as the executor of her estate,

21  and showed him what Miles believed to be documentary proof of the existence of the estate.  Miles

22  resisted Molina's request to serve as executor, but agreed to help oversee her affairs and to put her in

23  touch with others who could run her estate.  In 2009, Molina granted Miles power of attorney over

24  her estate, which was witnessed by Miles' friend Lisa Morales,[5] and ultimately appointed Miles

25  executor of the estate in 2015.[6]  To better help Shirley, Miles moved to California and lived out of a

26  _____

27  [2] *Id.*
[3] *Id.*
[4] Attachment B: Miles' 2005 Bank Records.

28  [5] Attachment C: 2009 Power of Attorney, at MILES-017939-945.
[6] Attachment D: 2015 Contract Between Molina and Miles, at MILES-017915-919.

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION          Case No. 15-CR-0561-LHK

hotel room for a decade.  He raised money alongside Molina, Munsif Shirazi, Robert Stephens, and Rayan Lakshmanan, by promising investors a large return on their contribution to a trust they said was set up to pay for Molina's medical expenses until the estate funds could be released from a lengthy probate proceeding.

Molina led Miles to believe that if she did not receive regular blood transfusions, she would die, and the estate would never be released.[7]  Miles considered Molina a very close friend, and believed she was telling him the truth.  Miles did not question Molina because of his long-standing belief in the duty to help others without first asking to "see their scars."  Miles also believed Molina when she told him that the government imposed a secret "gag order" upon the estate and that a violation of the gag order could jeopardize the estate's release.  For years, Molina represented to Miles that the release of the estate funds was imminent, and impressed upon him that he needed to do whatever necessary to keep her alive and make sure that her needs were met.  Miles believed that investors would receive $1,000 for every $1 invested once the estate was out of probate.  The investors, including Miles' family and friends, wired funds to accounts belonging to Miles and others.  Miles represented to investors that these funds would be used to pay for Molina's medical costs, knowing that some of the money would be used to pay for non-medical personal expenses for Miles and his co-defendants.  Miles believed that making these statements was the only way to secure the investments that were necessary to keep Molina alive, and ultimately, to pay everyone back.  Molina told Miles that she had difficulty communicating with other people and that she was relying on him to be her mouthpiece.  Miles consistently gave large sums of cash to Molina for the medical care he believed she needed and was receiving.[8]

In 2007, Miles was questioned along with Shirazi by the Huntington Beach Police Department for soliciting an off-duty police officer to invest in the estate.[9]  The police interrogated Miles on two separate days, and he maintained that he believed the estate was real.  The officers told

---

[7] Attachment E: Text Messages Between Molina and Miles.  The attachment is a spreadsheet listing select text messages between Molina and Miles; Shirazi and Miles; and Connie Cummings and Miles.  These text messages were extracted from a cell phone that Miles provided to defense counsel.  The forensics company KrollOntrack conducted a Cellebrite analysis of the phone, yielding the text messages set forth in the attachment.

[8] *Id.*; Attachment F: Munsif Shirazi Proffer, March 28, 2017, at MILES-068606.

[9] Attachment G: Huntington Beach Search Warrant and Affidavit.

- 4 -

Miles that the estate was fake, and that Miles had been "duped" by Molina.[10]  Miles was allowed to go on his way, and was never charged.  Shortly thereafter, Miles called the officer who had interrogated him to find out what to do.  The officer told him not to solicit people for money, but not to "shut anything down" pending his investigation.  Miles came to believe that because the police did not follow up, bring charges, or make any arrests, the estate was in fact real.[11]  He also believed that the police who arrested him were not initially aware of the gag order.

Years later, on December 17, 2015, Miles was arrested in the Central District of California and released on a $75,000 personal appearance bond.  Since his arrest, Miles has resided in rural Arizona in a trailer he does not own.  Miles recognizes the illegality of his actions, and accepts full responsibility for them.  He deeply regrets the false statements he made and the damage that he caused so many people who trusted him, believing as he did that he was serving a greater good.  Miles hopes that accepting responsibility for what he has done will allow the investors and his family to move beyond the devastating consequences of his actions.

## III.  A RANGE OF 57-71 MONTHS IS THE CORRECT INITIAL GUIDELINES CALCULATION

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  A range of 57-71 months is the correct initial guidelines calculation because Miles' adjusted offense level is 25 and his criminal history category is I.

### A.  Miles' Adjusted Offense Level Is 25

The Government and Miles agree that his base offense level is 7.[12]  The parties also agree that the following offense adjustments apply: (1) an 18-level increase under § 2B1.1(b)(1)(J) (amount of loss between $3.5 million and $9.5 million); (2) a 2-level increase under § 2B1.1(b)(2) (more than 10 victims); (3) a 1-level increase under § 2S1.1(b)(2)(A) (conviction for 18 U.S.C. § 1957); and (4) a 3-level reduction if Miles meets the requirements of § 3E1.1 (acceptance of

---

[10] Attachment F: Munsif Shirazi Proffer, March 28, 2017, at MILES-068603.
[11] *Id.* at MILES-068603.
[12] Attachment H: 15-CR-00561-LHK, Miles Plea Agreement (Apr. 6, 2017) [Dkt. # 90].

1   responsibility).[13]  The Government, however, is seeking two additional enhancements: (1) a 4-level

2   increase under § 3B1.1(a) (leader of criminal activity that involved five or more participants); and

3   (2) a 2-level increase under § 2B1.1(b)(10)(C) (use of sophisticated means).[14]  Because the

4   Government cannot meet its burden to demonstrate that either enhancement applies and Miles has

5   fully accepted responsibility for the offense, Miles' adjusted offense level is 25.

6   **1.    An Enhancement Under U.S.S.G. § 3B1.1 Is Not Warranted**

7           A role enhancement under § 3B1.1 is appropriate only if the Government demonstrates by a

8   preponderance of the evidence that the defendant was a leader, organizer, manager, or supervisor

9   over another participant.  *United States v. Harper*, 33 F.3d 1143, 1150-51 (9th Cir. 1994); *see also*

10  *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996).  A defendant is a leader, organizer,

11  manager, or supervisor if he "exercised some control over others involved in the commission of the

12  offense [or was] responsible for organizing others for the purpose of carrying out the crime."

13  *Harper*, 33 F.3d at 1151.  *See United States v. Brown*, 771 F.3d 1149, 1159 (9th Cir. 2014) ("[S]ome

14  degree of control or organizational authority over others is required in order for section 3B1.1 to

15  apply.") (internal citation omitted).  Miles did not exercise the requisite control over others necessary

16  for any role enhancement under Section 3B1.1.[15]  The following describes the roles of other

17  conspirators and their relationship to Miles, which demonstrates why an enhancement is not

18  appropriate in this case.

19          *Shirley Molina*.  There is no evidence that Miles had any control over Molina.  In fact, the

20  evidence demonstrates that *Molina* controlled *Miles*.  For example:

21          1.      Molina hired Miles to be the Executor of her estate and in that role, Miles reported to

22                  Molina;[16]

23

24  [13] *Id.*
    [14] *Id.*

25  [15] The Final Presentence Report ("PSR") states that Miles was an organizer or leader of a criminal
    activity that involved five or more participants or was otherwise extensive.  PSR, ¶ 73.  "[A]

26  sentencing court may not conclude that an enhancement is appropriate where, [as here], the record
    lacks evidence that the defendant exercised the requisite control—even if the presentence report

27  states that it is."  *United States v. Whitney*, 673 F.3d 965, 976 (9th Cir. 2012).

    [16] Attachment E: Text Messages Between Molina and Miles; Attachment F: Munsif Shirazi Proffer,
28  March 28, 2017, at MILES-068601; Attachment I: Robert Stephens Proffer, March 7, 2016, at
    MILES-036711.

2.      She told Miles how much money she needed from investors;[17]

3.      She informed Miles of the status of the estate, and Miles relayed that information to the investors and his co-defendants;[18]

4.      At Molina's behest, Miles regularly withdrew large sums of cash and gave them to her.[19]

5.      Molina was an experienced scammer, having been convicted in the past for being the ringleader of a nearly identical scheme.[20]  In committing her prior fraud, Molina manipulated Paul Herzwurm, the man who introduced Molina to Miles, into soliciting money from others, including his family and friends.[21]

The Ninth Circuit refused to impose a role enhancement under analogous facts.  In *United States v. Avila*, the court held that Avila was not an organizer or leader of a drug conspiracy under § 3B1.1(a). 95 F.3d 887 (9th Cir. 1996).  In that case, there was no evidence that Avila "coordinated or oversaw the procurement or distribution of drugs."  *Id.* at 891.  Although he "was the sole contact between the buyer and seller," Avila did not set or negotiate the price of the drug, or control the scope of the transaction.  *Id.*  "Rather, . . . he merely relayed the price of the cocaine, as set by his supplier, to the buyer."  *Id.*  The fact that he arranged the transactions on the supplier's behalf did not justify an upward adjustment.  *Id.* at 892.

Like Avila, Miles simply facilitated the fraud on Molina's behalf.  *Id.*; *see also United States v. Whitney*, 673 F.3d 965, 975-76 (9th Cir. 2012) (holding enhancement does not apply to a defendant who only "facilitated the crime").  The evidence suggests that Molina controlled the "key element[s] of the transaction": she created the false story about her estate and health problems, told Miles how much money she needed from investors, and informed him about the status of the

---

[17] Attachment E: Text Messages Between Molina and Miles; Attachment J: Transcript of Recorded Interview of Munsif Shirazi, December 4, 2015, at MILES-034519.
[18] Attachment E: Text Messages Between Molina and Miles; Attachment F: Shirazi Proffer, March 28, 2017, at MILES-06805.
[19] Attachment E: Text Messages Between Molina and Miles; Attachment F: Munsif Shirazi Proffer, March 28, 2017, at MILES-068606.
[20] Attachment K: Complaint and Investigative Report, *California v. Molina*, DA Case No. COM 0152351.
[21] Attachment L: Kathy Petherick 302, September 12, 2015, at MILES-017954.

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION                Case No. 15-CR-0561-LHK

estate.[22] *Avila*, 95 F.3d at 891 (holding enhancement does not apply because Avila "did not independently negotiate the key element of the transaction").  Miles, in turn, relayed those messages to the investors and his co-defendants.  It is irrelevant that he may have been Molina's sole contact, *see id; United States v. Lopez-Sandoval*, 146 F.3d 712, 718 (9th Cir. 1998), or that his role may have been "integral to the completion of the charged conspiracy."  *Whitney*, 673 F.3d at 976.  Because Miles did not exercise control or authority over Molina, a role enhancement is not appropriate.

*Robert Stephens*.  Stephens routinely acted independent of Miles' direction and control.  For example:

1. Stephens barely interacted with Miles.  In a proffer session with the Government, he explained that "he would talk to both Miles and Shirazi, but moreso [sic] to Shirazi.  Stephens estimated that he spoke to Shirazi 90 percent of the time."[23]

2. Stephens independently solicited investors.  For example, he frequently communicated with "Shoq Value" on Twitter and via email about the status of Molina's estate and illness.  There is no evidence that Miles knew about these communications—much less supervised or directed them.[24]

3. Stephens did not necessarily obtain Miles' approval on what to tell investors.  For example, Connie Cummings told the FBI that "when [she] spoke to both Robbie and Laurie on the same day she noticed that their information was always off."[25]  Similarly, on one occasion, "Stephens took over the second [investor] meeting with the undercover FBI special agent because he felt that Miles was being 'a stiff.'"[26]  In fact, Stephens told the FBI that he "had free reign over the narrative of the estate investment."[27]

---

[22] There is no dispute that Molina fabricated the story told to investors.  Molina pled guilty to defrauding others using the exact story in 1994— years before she met Miles.  Attachment K: Complaint and Investigative Report, *California v. Molina*, DA Case No. COM 0152351.  She also admitted to the FBI that she made up the story, and never told Miles that it was not true.  Attachment M: Shirley Molina 302, June 16, 2016, at MILES-000346.
[23] Attachment I: Robert Stephens Proffer, March 7, 2016, at MILES-036709.
[24] Attachment N: Emails Between Robert Stephens and "Shoq Value."
[25] Attachment O: Connie Cummings 302, May 28, 2015, at MILES-000333.
[26] Attachment I: Robert Stephens Proffer, March 7, 2016, at MILES-036713.
[27] *Id.*

4.     Stephens recruited Lakshmanan into the scheme, and gave him instructions on how to proceed.  He also "enlisted the assistance of Robert McFarlane, Jaison Starkes, and Scott Anderson to solicit additional investors."[28]  These efforts were coordinated in Northern California, where Stephens resided.  There is no evidence that Miles, who lived in Los Angeles, directed these efforts.

5.     Stephens took investor money as he wanted.  Miles did not dictate when or how much money Stephens could take.[29]

6.     Stephens and Lakshmanan kept records of investor monies even though "Miles and Shirazi never asked for the accounting."[30]

7.     Stephens has done this before.  He was previously accused in a civil lawsuit of perpetuating a Ponzi scheme.[31]  The complaint included counts of fraud, securities violations, elder financial abuse, and breach of fiduciary duty.  As here, Stephens allegedly solicited and recruited investors: "Defendants ORGOLINI and STEVENS [*sic*] were in charge of selling the scheme, and with recruiting, creating, arming, and managing a sales force with the documents and trappings of the scheme, and with promises of lucrative 'commissions,' to sell the scheme to individual 'investors[.]'"  Ultimately, a default judgment was entered against Stephens.

These facts demonstrate that Miles had no real authority over Stephens, who essentially did as he pleased.  *Cf. United States v. Rivera*, 527 F.3d 891 (9th Cir. 2008) (applying enhancement because the defendant directed his co-defendants to make wire transfers and to retrieve or deliver narcotics).  Indeed, Stephens had a very significant role, and the record clearly shows that he directed the efforts of Lakshmanan.  He also appears to have had longstanding familiarity with investment fraud schemes dating back to 1999—long before Miles moved to California to help with Molina's estate.[32]

---

[28] Attachment P: Robert Stephens Proffer, June 28, 2016, at MILES-036717.
[29] Attachment I: Robert Stephens Proffer, March 7, 2016, at MILES-036710.
[30] *Id.* at MILES-036715.
[31] Attachment Q: Third Amended Complaint, *Lynn Forslund, et al. v. Scott J. Rein, et al.*, No. 8:01-cv-01085-GLT-AN (C.D. Cal. Sept. 16, 2002) [Dkt. # 47].
[32] Attachment Q: Third Amended Complaint, *Lynn Forslund, et al. v. Scott J. Rein, et al.*, No. 8:01-cv-01085-GLT-AN (C.D. Cal. Sept. 16, 2002) [Dkt. # 47].

The Government, however, did not insist on a role enhancement for Stephens.  But given Stephens'

dominant role, it would be inequitable to impose a role enhancement on Miles, but not on Stephens.

*Rayan Lakshmanan.*  There are no facts in the record that show Miles exercised any control

or authority over Lakshmanan.  For example:

1.    Lakshmanan had almost no contact with Miles.  He told the FBI that he first met

    Miles in 2014 at an investor pitch.  He explained that he "stayed at the meeting, but []

    was just there to drive Stephens and said nothing."[33]  Before that, he was only 'told

    about" Miles by Stephens and Robert MacFarlane, an investor.[34]  Lakshmanan was

    recruited by Stephens, took directions from him, and served as his "assistant" and

    "shadow."[35]

2.    Lakshmanan independently solicited investors.  For example, he frequently

    communicated with Jonathan Farkas.  There is no evidence that Miles supervised or

    directed these communications, or even knew about them.[36]

Therefore, unless the Government identifies "evidence in the record" that shows Miles "exercised

the necessary level of control" over Lakshmanan, a role enhancement is not warranted.  *Whitney*,

673 F.3d at 975 (internal citation omitted).

*Munsif Shirazi.*  Section 3B1.1 does not apply because Miles did not exercise the requisite

control over Shirazi.  For example:

1.    Miles did not recruit Shirazi into the scheme.  Shirazi told the FBI in a proffer session

    that he was introduced to the scheme by Dante Orgolini, and that he knew Orgolini

    and Stephens before he met Miles.[37]

2.    Miles never ordered Shirazi to solicit investors or what to tell investors.  Shirazi

    primarily spoke with Stephens on what to tell the investors about the estate and

    Molina's illness.  "Stephens estimated that he spoke to Shirazi 90 percent of the

    time," and he "would tell Shirazi that they needed to spin things a certain way to get

---

[33] Attachment R: Rayan Lakshmanan 302, December 4, 2015, at MILES-017982-983.
[34] *Id.*
[35] Attachment I: Robert Stephens Proffer, March 7, 2016, at MILES-036713.
[36] Attachment S: Emails Between Rayan Lakshmanan and Jonathan Farkas.
[37] Attachment F: Munsif Shirazi Proffer, March 28, 2017, at MILES-068601-602.

1    people to invest."[38]  There is no evidence that Miles participated or directed those

2    discussions.

3    3.    Shirazi could take as much investor money as he wanted.  "Miles would transfer

4    whatever Shirazi needed into Shirazi's account."[39]  Shirazi would then spend that

5    money on whatever he wanted—from fancy cars to his son's college tuition.[40]

6    4.    Some investor money was deposited into bank accounts that Miles and Shirazi shared

7    and that were linked with Shirazi's home address.[41]

8    Notwithstanding the above, the Government may argue that § 3B1.1 applies because (1)

9    Miles introduced himself to investors as the "Executor" and/or "Trustee" of Molina's estate, and (2)

10   most investor funds were wired to Miles' bank accounts.  Both arguments are unpersuasive.

11   **First**, Miles' role as the "Executor" and/or "Trustee" has no bearing on whether § 3B1.1

12   applies.  *See, e.g.*, *United States v. Brown*, 771 F.3d 1149, 1158 (9th Cir. 2014) (reversing two-level

13   enhancement because "adjustment was based [solely] on Edding's introduction to some victims as

14   Brown's business partner and Edding's recruitment of investors").  *See also Whitney*, 673 F.3d at

15   976 ("[T]he centrality of Whitney's role is not relevant to the imposition of the role

16   enhancement.").[42]  What matters is whether he exercised the requisite control over others.  *Brown*,

17   771 F.3d at 1159.  As discussed above, Miles's conduct does not meet that standard.

18   **Second**, Miles' "management" of investor funds (really, just the storage of funds in bank

19   accounts)—without more—does not warrant a role enhancement.  The Ninth Circuit has made clear

20   that "management of property or assets of a criminal organization . . . is insufficient to warrant

21   application of the enhancement, as a court must find a defendant exercised some level of control

22   over another participant prior to applying the enhancement."  *United States v. Suarez*, 655 Fed.

23   Appx. 549, 550 (9th Cir. 2016) (interpreting § 3B1.1, Application Note 2); *Whitney*, 673 F.3d at 975

24   n.6.  There is no evidence that Miles controlled who could invest, or how much money the other co-

25   ───────────────────

[38] Attachment I: Robert Stephens Proffer, March 7, 2016, at MILES-036709, -036712.

26   [39] Attachment F: Munsif Shirazi Proffer, March 28, 2017, at MILES-068610.

[40] Attachment J: Transcript of Recorded Interview of Munsif Shirazi, December 4, 2015, at MILES-

27   034521, -034532.

[41] Attachment T: Miles and Shirazi's Bank records, at MILES-066432, 030577.

28   [42] *See also* § 3B1.1, Application Note 4 ("In distinguishing a leadership and organizational role from
one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.").

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION          Case No. 15-CR-0561-LHK

1    defendants could take.  *See Avila*, 95 F.3d at 891 (refusing to impose enhancement because Avila

2    "did not stand to profit the most from the transaction").  As Shirazi told the FBI, "[t]here was no

3    agreed upon structure of how investor funds were used or divided up, and there were never any

4    discussions or complaints among those involved in the scam about how the funds were divided."[43]

5         Because Miles did not exercise the requisite control over any of the other co-conspirators,

6    and was not the leader or organizer of the conspiracy, a role enhancement under Section 3B1.1 is not

7    warranted.

8         **2.    An Enhancement Under U.S.S.G. § 2B1.1(b)(10)(C) Is Not Warranted**

9         A court may impose a two-level enhancement under § 2B1.1(b)(10)(C) only if the offense

10    "involved sophisticated means and the defendant intentionally engaged in or caused the conduct

11    constituting sophisticated means."  The Application Notes define "sophisticated means" as

12    "especially complex or especially intricate offense conduct pertaining to the execution or

13    concealment of an offense."[44]  Put differently, the enhancement does not apply if the defendant only

14    engaged in conduct that constitutes a "routine offense."  *United States v. Carter*, No. CR 09-0444

15    CRB, 2010 WL 1342812, at *1 (N.D. Cal. Apr. 5, 2010) (quoting *United States v. Arabaye*, 234 F.3d

16    1101, 1108 (9th Cir. 2000), *superseded by statute on other grounds as recognized by United States v.*

17    *McEnry*, 659 F.3d 893, 899 n.8 (9th Cir. 2011)).

18         Miles did not engage in any conduct that qualifies as "sophisticated means."  He did not use

19    (1) "fictitious entities [or] corporate shells,"[45] *United States v. Brandon*, 595 Fed. Appx. 676, 679

20    (9th Cir. 2014); (2) "offshore financial accounts,"[46] *United States v. Mehdi*, 511 Fed. Appx. 662, 663

21    (9th Cir. 2013); (3) "multiple names, addresses, and bank accounts in multiple states," *id.*; (4) "false

22    name[s] and social security number[s]," *United States v. Aragbaye*, 234 F.3d 1101, 1108 (9th Cir.

23    2000); (5) a "complicated and fabricated paper trail [to] ma[ke] discovery of his fraud difficult,"

24    *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013); (6) "sophisticated equipment and tools,"

25    such as a "credit card embosser," *Carter*, 2010 WL 1342812, at *2; or (7) "coordinated and

26

27    [43] Attachment F: Munsif Shirazi Proffer, March 28, 2017, at MILES-068610.
       [44] U.S.S.G. § 2B1.1(b)(10), Application Note 9(B).
28    [45] *Id.*
       [46] *Id.*

- 12 -

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION          Case No. 15-CR-0561-LHK

1  repetitive steps" that involved "dozens of various acts."  *United States v. Thomsen*, 830 F.3d 1049,

2  1073 (9th Cir. 2016).

3          Instead, the scheme was shockingly simple.  Miles admitted in his plea agreement to falsely

4  telling investors he would use their funds to support Molina's medical care when he knew that some

5  of the money would be used for his and his co-conspirators' personal use.  In doing so, he would

6  give investors a basic, one-page form that promised the investor a return on his or her contribution.

7  The form included Miles' real name and address that he used.[47]  Those statements induced investors

8  to wire funds to legitimate bank accounts opened under the names of Miles, Shirazi, and Stephens.

9  Miles gave the investor money to the other defendants for their personal use, and spent some of the

10  money on himself.  There is nothing "especially complex or especially intricate" about what he did.

11  Indeed, the fact that Miles used his own name and opened legitimate bank accounts illustrates that he

12  did *not* use sophisticated means.  A two-level enhancement under § 2B1.1(b)(10)(C) is therefore not

13  appropriate.

14              **3.      Miles Has Fully Accepted Responsibility for the Offense**

15          Miles has and continues to take full responsibility for the offense.  He fully admits that he

16  lied to investors when he used their money for his personal use, rather than for Molina's medical

17  care.  He understands that it was wrong, and strongly believes that he must accept what he has done

18  and the consequences of doing it.  He is extremely remorseful for what he has done, and told the

19  Probation Officer that he "will do whatever he can to pay the restitution to the victims."[48]  Since

20  pleading guilty, he has fully cooperated with the Court and the Probation Officer in his presentence

21  investigation.  In the PSR, the Probation Officer deducted three points because Miles "has clearly

22  demonstrated acceptance of responsibility" and "has assisted authorities . . . by timely notifying

23  [them] of [his] intention to [plead guilty]."[49]  This Court should adopt the Probation Officer's

24  recommendation on this point.

25

26

27  _____

[47] Attachment U: Miles Statement of Release Form.
28  [48] PSR, ¶ 63.
[49] *Id.* at ¶¶ 77-78.

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION          Case No. 15-CR-0561-LHK

**B.      Miles' Criminal History Category is I**

Miles' criminal history category is I because he has no criminal record.[50]

*****

To summarize the above calculations:

| | |
|---|---|
| Base offense level, § 2B1.1: | 7 |
| Amount of loss, § 2B1.1(b)(1)(J): | +18 |
| More than 10 victims, § 2B1.1(b)(2): | + 2 |
| Conviction for 18 U.S.C. § 1957, § 2S1.1(b)(2)(A): | +1 |
| Acceptance of responsibility, § 3E1.1: | -3 |
| **Adjusted offense level:** | **25** |
| **Criminal history category:** | **I** |
| **Guidelines Range:** | **57-71 months** |

**IV.      A DOWNWARD VARIANCE FROM THE GUIDELINES RANGE TO FOUR MONTHS MEETS THE REQUIREMENTS OF 18 U.S.C. § 3553(A)**

After calculating the applicable guidelines range, "the district court should then consider the [factors set forth in 18 U.S.C. § 3553(a)] to decide if they support the sentence suggested by the parties." *Gall*, 552 U.S. at 49-50.  The court "must make an individualized assessment based on the facts presented," *id.*, and impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [§ 3553(a)]."  18 U.S.C. § 3553(a).  A downward variance to four months meets these requirements.

**A.      Factor One: The Nature and Circumstances of the Offense, and the History and Characteristics of Miles Support the Requested Sentence**

**1.      The Nature and Circumstances of the Offense**

The nature and circumstances of the offense conduct support the requested sentence.  Miles has and continues to fully admit that he lied to investors when he used (some of) their money for his own use, rather than for Molina's medical care.  He does not dispute that this was wrong and that he should be punished for his actions.  However, unlike the other defendants, this is Miles' first offense.

---

[50] U.S.S.G. §§ 4A1.1, 5.A; PSR, ¶ 84.

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION                    Case No. 15-CR-0561-LHK

Stephens has been involved in other investment scams, in which he occupied the same role he did here.[51]  And Molina was previously convicted for perpetuating this exact fraud.[52]  Miles also did not hold a leadership position in this scheme.  This case involved an essentially flat organization with no real delineation of responsibility.  Miles and the other defendants (except Molina, the center of the conspiracy) simply solicited money from investors.  Nor is there sufficient evidence that Miles substantially benefited from the scheme.  While Shirazi used investor funds to pay his mortgage and son's college tuition,[53] at most the evidence shows that Miles paid for his living expenses and occasionally bought modest gifts for his family and friends—many of whom had contributed money to Molina.  In fact, Miles routinely turned over large sums of cash to Molina because he thought he was helping her.[54]  If anything, this scheme has left Miles completely destitute.

### 2.    Miles' History and Characteristics

Miles' history and personal characteristics also support the requested sentence.  Miles is 76 years old,[55] and suffers from significant health problems.[56]  He has a serious eye condition, macular degeneration and retinitis pigmentosa, that has severely impaired his vision.[57]  He can no longer drive and has lost the ability to do many things on his own.  For most of his pretrial release, Miles relied on his friend Tom Watson to help him get around.  He also suffers from diabetes.[58]  And last year, the toe on his foot became infected and he had to get it surgically removed; this has "cause[d] him to be unsteady on his feet."[59]  These physical impairments have been especially challenging because this scheme has left Miles destitute and alone.  He currently lives in a senior care facility in a rural town, 400 miles outside of Phoenix, far from his ex-wife in Atlanta and family in the U.K.

---

[51] Attachment Q: Third Amended Complaint, *Lynn Forslund, et al. v. Scott J. Rein, et al.*, No. 8:01-cv-01085-GLT-AN (C.D. Cal. Sept. 16, 2002) [Dkt. # 47].
[52] Attachment K: Complaint and Investigative Report, *California v. Molina*, DA Case No. COM 0152351.
[53] Attachment J: Transcript of Recorded Interview of Munsif Shirazi, December 4, 2015, at MILES-034521, -034532.
[54] *Supra* II.B.
[55] U.S.S.G. § 5H1.1 (Age Policy Statement).
[56] U.S.S.G. § 5H1.4 (Physical Condition Policy Statement).
[57] Attachment V: Psychological Evaluation, Scott Lines, Ph.D., July 11, 2017.
[58] *Id.*
[59] *Id.* at 8.

- 15 -

Miles also has exhibited mental and emotional conditions that are "unusual [in] degree and atypical."[60]  Licensed psychologist Dr. Scott Lines assessed Miles' mental condition in an interview on June 28, 2017.[61]  They discussed Miles' personal and family history as well as Miles' conduct in Molina's scheme.  Dr. Lines observed that it was difficult for Miles to discern fiction from reality. While Miles was "able to admit that the estate is a fiction, and as such that he participated in fraudulent actions," Miles also at times expressed that he still believes that Molina will soon inherit a large estate.[62]  It is Dr. Lines' clinical opinion that "this borders on delusional thinking" and "is very close to the full manifestation of the disorder."[63]  Dr. Lines further observed that Miles is rigid in his thinking.  "[Miles] believed in the[] story from the outset and was unable to reconsider his acceptance of [it] in light of new facts."[64]  According to Dr. Lines, because of Miles' "deep-seated psychological need to view himself as a helpful savior to an ill woman" and to "do the right thing," Miles "needed to view subsequent facts as confirming rather than disconfirming the initial faith he placed in [the] fraud."[65]  Dr. Lines believes that these characteristics made Miles "vulnerable," and an "ideal target" for Molina to further her scheme.[66]

In addition, Miles has no prior criminal history.  From a young age, he was taught the importance of giving back and to always place the needs of other first.  He is deeply repentant for what he has done and accepts full responsibility for his actions.  It is not who he is, or who he wants to be.

**B.    Factor Two: A Sentence of Four Months Would Honor the Sentencing Goals Described in 18 U.S.C. § 3553(a)(2)**

**1.    Promoting Respect for the Law and Providing Just Punishment for the Offense**

A sentence of four months provides just punishment.  Unlike the Government's proposed sentence, it does not overstate Miles' role in Molina's scheme, and is commensurate with his

---

[60] U.S.S.G. § 5H1.3 (Mental and Emotional Conditions Policy Statement).
[61] Attachment V: Psychological Evaluation, Scott Lines, Ph.D., July 11, 2017.
[62] *Id.* at 6-7.
[63] *Id.* at 7.
[64] *Id.*
[65] *Id.*
[66] *Id.*

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION                    Case No. 15-CR-0561-LHK

conduct.  It also reflects Miles' acceptance of responsibility.  Although the scheme has been financially ruinous for him, he is willing to use any money he may earn or otherwise obtain to pay back the victims.

The requested sentence also promotes respect for the law.  It signals to others that no matter your age—young or old—knowingly taking money based on false statements will be met with severe punishment.  Not only may Miles face a term of imprisonment, but he is also subject to millions in restitution and forfeiture.[67]

### 2.    Affording Adequate Deterrence to Criminal Conduct and Protecting the Public from Further Crimes by the Defendant

A sentence of four months would specifically deter Miles from committing future crimes.  First, Miles has no incentive or desire to commit future crimes.  He is extremely remorseful for what he has done, and would never wish to put innocent strangers or his family through such anguish again.  Second, Miles' history and personal characteristics indicate he is unlikely to reoffend.  Miles is 76 years old and has no criminal history.  "Studies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending."[68]  They also show that defendants with longer criminal histories are more likely to reoffend upon release than defendants with shorter or non-existent criminal histories, like Miles.[69]

Furthermore, Dr. Lines' report demonstrates that Miles was drawn into this scheme when Molina convinced him that her illness and estate were real.  Miles' clinically rigid thinking prevented him from reconsidering his belief in Molina's predicament in light of new facts, while his "deep-seated psychological need to view himself as a helpful savior to an ill woman" impelled him to continue soliciting money from investors.  In short, Molina victimized Miles, taking advantage of his unique psychological vulnerabilities and enlisting him in the latest iteration of her cynical scheme.  Absent Molina, Miles never would have committed this crime.  He is highly unlikely to reoffend.

---

[67] Attachment H: 15-CR-00561-LHK, Miles Plea Agreement (Apr. 6, 2017) [Dkt. # 90].
[68] *See* Recidivism Among Federal Offenders: A Comprehensive Overview, United States Sentencing Commission, at 23 (March 2016), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.
[69] *Id.* at 19.

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION          Case No. 15-CR-0561-LHK

1     A sentence of four months would also generally deter the public from committing the same

2  offense.  The magnitude of the sentence and monetary penalties at Miles' age will deter others from

3  committing the same crime.

4           **3.      Providing Educational or Vocational Training or Other Correctional
                       Treatment**
5

6     A sentence of four months would allow Miles to participate in necessary mental health

7  treatment.  As explained above, Miles has exhibited atypical mental and emotional conditions.  Dr.

8  Lines recommended that Miles would benefit from counseling given his inability to discern reality

9  from fiction, and his overall declining health.[70]

10 **V.    MILES OBJECTS TO THE PRESENTENCE INVESTIGATION REPORT AND THE
           GOVERNMENT'S CALCULATION OF LOSS**
11

12        **A.      Miles Objects to the Government's Investor Loss List**

13     Miles objects to the government's chart of investor loss provided to Miles and U.S. Probation

14 on July 5, 2017.  The chart includes uncorroborated victim losses referred to as "uncorroborated

15 source for loss."  These losses are not only uncorroborated, but include speculative loss amounts for

16 victims who have not claimed any loss with the government, that might be duplicative of other listed

17 loss amounts, and that should not be considered in the amount of total loss.  Miles likewise objects to

18 the government's other listed uncorroborated loss amounts because they are self-serving and

19 inherently unreliable.

20        **B.      Miles Objects to the Presentence Investigation Report Prepared by Probation**

21     Miles objects to the Presentence Investigation Report ("PSR") filed on July 11, 2017 by U.S.

22 Probation Officer Kyle Pollak.  Miles served objections to Mr. Pollak's June 21, 2017 initial PSR on

23 July 5, 2017.  While Mr. Pollak addressed some of Miles' objections in his final PSR, he did not

24 address other objections that are material to sentencing, and did not resolve the objections in an

25 addendum as required by Fed. R. Crim. P. 32(g) and Crim. L.R. 32-5.  For example, the PSR failed

26 to resolve, or to provide an addendum stating why it did not resolve, Miles' objection that the PSR

27 failed to include material information about other defendants' role in the scheme, which bears on

28
_____
[70] Attachment V: Psychological Evaluation, Scott Lines, Ph.D., July 11, 2017, at 8.

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION          Case No. 15-CR-0561-LHK

1    Miles' role.  Miles additionally objects to the PSR's adoption of the uncorroborated loss amounts for

2    guidelines purposes of total loss, for the reasons discussed in Part V.A.

3          Miles' complete objections to the July 11, 2017 PSR are attached as Attachment W.

4    **VI.     CONCLUSION**

5          For the foregoing reasons, this Court should sentence Laurence Miles to a term of

6    imprisonment of four months.

7

8    DATED:  July 19, 2017                    /s/ *Mark D. Flanagan*___

9                                             Mark D. Flanagan (SBN 130303)
                                             mark.flanagan@wilmerhale.com
10                                            WILMER CUTLER PICKERING
                                               HALE AND DORR LLP
11                                            950 Page Mill Road
                                             Palo Alto, CA 94304
12                                            Telephone: +1 650 858 6000
                                             Facsimile: +1 650 858 6100

13                                            Timothy Charles Perry (SBN 248543)
                                             timothy.perry@wilmerhale.com
14                                            WILMER CUTLER PICKERING
                                               HALE AND DORR LLP
15                                            350 South Grand Avenue, Suite 2100
                                             Los Angeles, CA 90071
16                                            Telephone: +1 213 443 5306
                                             Facsimile:  +1 213 443 5400

17

18                                            *Attorneys for Defendant*
                                             LAURENCE MILES

19

20

21

22

23

24

25

26

27

28

LAURENCE MILES' SENTENCING MEMORANDUM & MOTION          Case No. 15-CR-0561-LHK